875 A.2d 132

James Paul GOFF

v.

STATE of Maryland.

No. 102, Sept. Term, 2004.

Court of Appeals of Maryland.

June 6, 2005.

330

Peter F. Rose, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

On April 25, 2003, the State charged James P. Goff with a number of crimes, including, *inter alia,* burglary, assault, trespass, and malicious destruction of property, resulting from an incident occurring on February 28, 2003, at the apartment of Patrick Hadley. On August 19, 2003, Mr. Goff entered a plea of not guilty in the Circuit Court for Carroll County and proceeded on an agreed statement of facts. The court found him guilty of second-degree assault and trespass.[1] The State dismissed the remaining counts. The court ordered Mr. Goff to pay a fine in the amount of $150.00 for the trespass. In addition, the court sentenced Mr. Goff to eighteen-months incarceration for the assault, suspended that sentence, and placed him on two years of supervised probation. The court also ordered, as a condition of probation, that Mr. Goff pay restitution in an amount to be determined. Months later, the court held a hearing on restitution, and on February 17, 2004, ordered Mr. Goff to pay $2,156.00 to Patrick Hadley, the victim of the assault. Mr. Goff appealed to the Court of Special Appeals. On December 17, 2004, before the case was heard in the Court of Special Appeals, we granted *certiorari* on our own initiative. *Goff v. State,* 384 Md. 448, 863 A.2d 997 (2004).

The only question before us is whether the Circuit Court's order of restitution was proper. We hold that the court did not err by ordering Mr. Goff to pay restitution to the victim of

---

1. The court also found Mr. Goff guilty of driving on a suspended license, but that conviction has no relevance to this case.

the assault because the damage to property was a direct result of the assault and the victim was responsible for repairing the property.

## FACTS

As previously noted, the parties proceeded on an agreed statement of facts, which included, in pertinent part, the following:

> Your Honor, had the State proceeded to trial, we would have also called Officer Warehime and he would have testified that, on Friday, February 28th of 2003, at approximately 12:44 a.m., he responded to the address of 3181 Main Street, in Manchester, Carroll County, State of Maryland, for an assault in progress.

> Upon arrival, he observed the Defendant, James Paul Goff, standing on the porch of that address. Previously, Goff had been advised that he was not to be at that home and had been notified by the lessee, who is Patrick Hadley, not to come onto the property. Officer Warehime had been present ... and had advised the Defendant that he would be arrested next time the Officer had seen the Defendant at that address.

> At that time, Officer Warehime spoke with Patrick Michael Hadley, the lessee of the property. Hadley stated that Goff knocked down the door and demanded to see Hadley's then girlfriend, Dana Karen Barnes, also known as Dana Smith. Hadley then stated that he told Goff to go away. Goff then forced his way into his apartment ... and began to strike Hadley repeatedly with a closed fist. Hadley further stated that Goff was pushing him around the living room and that they ended up in the bathroom. Hadley stated that Goff had pinned him in the shower where he struck him several times in the face. Officer Warehime saw that Hadley had a bloody face and *that the shower insert in the bathroom had been broken due to the assault.*

(Emphasis added.) Before reciting those facts, the State informed the court that, "[o]ur recommendation would be to

defer to the [c]ourt, ask for restitution for the shower, and ask for no contact with Patrick Hadley or Dana Smith...." In addition, after the court found Mr. Goff guilty, defense counsel noted that Mr. Goff was "willing to make restitution. I'm assuming at some point the State ... will get us a figure on that[.] [I]t was one of these shower inserts that got cracked and we need ... some sort of statement on that." The trial judge ordered that, "[d]efendant is to pay restitution in an amount to be determined. I'll give the State thirty days to submit restitution figures. In the event that the figure is disputed, of course, we can have a hearing."

The parties disagreed about the figure and on February 11, 2004, the court held a hearing on restitution. Defense counsel noted at the start of the hearing that Mr. Goff agreed to pay restitution, "with the understanding that it was five hundred dollars, or less." The State called Mr. Hadley to the stand who testified that he rented the apartment in which the assault took place. Mr. Hadley described the damage to the shower as follows:

> There's [sic] numerous holes and cracks all through the side of the shower. The panels that are glued on to either side of the shower that are like two by two, they've popped off and I cannot reattach them. I have—right now, to keep the water damage down, I have duct tape and trash bags hanging over the holes to keep the water from going through the shower.

He also testified that the damage occurred as a result of the fight and that he had not yet fixed the shower because he did not have the money to do so. The State introduced an estimate of the cost to replace the shower in the amount of $2,156, obtained by Mr. Hadley from Caton Plumbing. The written estimate, signed by an estimator named Kevin Ohl, did not differentiate between costs of labor and materials but did provide a list of materials needed and work expected to be completed.

Mr. Hadley testified that he obtained the estimate from Caton Plumbing because he worked for that company and it

was convenient.[2] He also testified that he reported the shower damage to his landlord, who did not replace it because he considered it Mr. Hadley's responsibility.

Mr. Goff also testified at the hearing on February 11. He stated that he earned $14.00 per hour as a carpenter and that he could not afford to pay the estimated cost to replace the shower. Mr. Goff attempted to testify about the cost of a fiberglass shower wall kit that he saw at Lowe's. The State objected and the court continued the hearing to give Mr. Goff an opportunity to obtain his own written estimate of the cost to replace the shower.

When the hearing resumed on February 17, Mr. Goff testified that he had obtained an estimate from Lowe's for the cost of a "surround kit." Lowe's estimated the cost of the kit as $111.30. Mr. Goff also testified that he obtained an estimate for the cost of repairing the shower from a contractor, Mr. Blizzard of "B. D. Blizzard Construction," in the total amount of $513.00, including $88.00 for the shower kit and $425.00 for labor. The estimate obtained from Mr. Blizzard was handwritten on a generic invoice, without letterhead, and was signed by Mr. Blizzard. Mr. Goff admitted on cross-examination that he did not know if Mr. Blizzard was a licensed plumber.

The State called Kevin Ohl as a rebuttal witness. He testified that he was a plumbing estimator for Caton Plumbing and that he had held that position for ten years. He also testified that the estimate from Lowe's was for a "shower and wall set" and that there was no listing of a base or the actual wall kit itself.[3] He also mentioned that the Lowe's estimate

---

2. Mr. Hadley is a master plumber who does new construction. He testified that he does not make repairs and that he did not want to attempt to repair the shower himself because "if something is wrong with the shower, I don't want it to have to come back on me. I'd rather have the company that's doing the work stand behind it and guarantee it and be responsible if there's anything wrong with the new installation."

3. Mr. Ohl explained what he meant by "shower and wall set" by stating:

did not account for replacement of the green wall board or replacement of the drain and some of the piping. In view of the fact that the shower was very old, Mr. Ohl testified that he expected the repair to include stripping the shower down to the studs, putting up waterproof sheetrock, and then installing the new shower.[4] He testified that he believed it would take ten to twelve hours to complete the project.

Regarding the estimate provided by Mr. Blizzard, Mr. Ohl testified that it did not account for a sufficient amount of hours of work to replace the shower.[5] In addition, Mr. Ohl testified that a competitive hourly rate for plumbing work is $122.00 per hour and that the Blizzard estimate included an hourly rate of approximately $50.00 per hour. Moreover, the Blizzard estimate contained no mark up on the supplies needed to replace the shower. Mr. Ohl concluded that Mr. Blizzard would be "losing a lot money" if he completed the work at the price estimated.[6]

---

They're basically pieces that connect the panels in the corners. You get corner pieces that are fiberglass that basically connect those corners together. When you buy a shower, you buy the separate parts. The only way to buy a shower intact would be a one-piece shower that you put in a new construction house that you can never get into a house that's already been pre-made, because that type of shower that you would get a price on—if I went in and asked for a shower wall kit and just got one price for a shower wall kit, it would be a one-piece shower that's prefab that's already put together. You could never get that into a house because the house is already built, so when you go back in to redoing a shower that's been damaged or needs to be replaced, you have to buy the pieces of the shower and they have to be put together.

4. At that point in the questioning, defense counsel conceded that the Lowe's price only contained an estimate for the cost of a shower kit and did not contain an estimate for labor.

5. Mr. Blizzard's estimate stated that the repair would take between six and eight hours.

6. Mr. Ohl testified that it would cost him approximately $315.00 to purchase a Swan white fiberglass shower wall kit and approximately $105.00 to purchase the shower base, not including mark-up. He also testified that three sheets of green wall board would cost $18.00.

At the conclusion of the hearing, the trial judge ordered restitution in the amount of $2,156.00 and made the following remarks:

Well, I guess the thing is, I think there was some testimony last week that the thing simply could not be repaired. Numerous cracks and holes, which were a direct result of the incident which led to Mr. Goff being convicted.

\* \* \*

Here what we have is an item which was probably, prior to the incident, perfectly functional and after the incident, it's not functional ... it's not the value of the shower stall here, it's the value of the materials and services needed to replace it because it's no longer functional and I think the testimony, the last time, was adequate to establish that.

So, then, the issue is, what is a fair amount of restitution, assuming that the item has to be replaced ... it is the burden of the Defendant to show that the suggested charges by the State are not fair and reasonable and that I think the Defendant has—has not met his burden. I think that, based upon what we—we have heard over both hearings, I—I think that, although it sounds like a lot of money, anytime you have damage to something in a home which is going to require some degree of labor, it doesn't take very long to run up a—a total, which is probably going to be more than the home owner expects.

Now, one of the questions that I had in this case was, is the tenant—and everybody seems to be operating under the assumption that—in a situation like this, that it's necessarily the tenant's responsibility—well, the landlord appears to believe that it's the tenant's responsibility. Actually, I think there's an argument that can be made that it's not the tenant who is really the victim; it's the landlord who—who's the victim, since he's the property owner and anytime the property owner has damage to his property—of course, I can understand the landlord taking the position saying, well, I'm not the one that has to use the shower. I'll just lay it in the lap of the tenant and let him collect on my behalf. And,

I guess I can't argue with the logic, but I think there is certainly an argument that can be made that perhaps the landlord is responsible for repairing it and perhaps he's the one who's entitled to restitution.

Mr. Hadley seems to take the position that he believes it's his responsibility and that he ought to, you know, take care of it. One thing that concerned me, quite honestly, is suppose the money is paid by Mr. Goff and the property never gets repaired. Suppose Mr. Hadley moves out at some point in time and the property never is repaired and then is the—could the landlord come back, potentially sue Mr. Goff as a person who perpetrated this and Mr. Goff would have paid the money in restitution to Mr. Hadley. So, I'm assuming that any money paid here will be used for the intended purpose.... I would not be happy to learn that that didn't happen....

I think the—the estimate, taking everything in consideration provided at the last hearing is—is fair and reasonable and I order restitution in that amount [$2,156.00].

The court ordered payment of the restitution through the Division of Parole and Probation and full payment no later than October 20, 2004.

## STANDARD OF REVIEW

 Md. Rule 8–131(c) states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

The issue raised in this case involves a review of the facts found by the trial judge as well as the interpretation of a statute. Our review of the statute is *de novo*. As noted in *Nesbit v. Government Employees Insurance Company*, 382 Md. 65, 854 A.2d 879 (2004):

The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions. When the trial court's [decision] "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review."

*Nesbit,* 382 Md. at 72, 854 A.2d at 883 (internal citations omitted). We will not disturb the judgment on the facts, however, unless the trial court's findings are clearly erroneous. " 'If there is any competent evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous.' " *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004) (quoting *Fuge v. Fuge,* 146 Md.App. 142, 180, 806 A.2d 716, 738 (2002)).

## DISCUSSION

■ As very recently discussed in *Williams v. State,* 385 Md. 50, 867 A.2d 305 (2005),

"Restitution imposed under [§ 11–603 of the Criminal Procedure Article] "is a *criminal sanction,* not a civil remedy." *Grey v. Allstate Insurance Company,* 363 Md. 445, 451, 769 A.2d 891, 895 (2001) (emphasis in original). Judge Wilner, writing for this Court in *Grey,* traced the history of restitution and explained that it serves retributive, deterrent, and rehabilitative objectives, which are the principal functions of criminal punishment. *Id.* at 459–60, 769 A.2d at 899–900. We explained that penal goals are accomplished through restitution to the extent that the defendant is forced to focus on the harm that was caused to the victim. *Grey,* 363 Md. at 459, 769 A.2d at 899. Likewise, restitution is a monetary detriment to the defendant and "satisf[ies] society's demand for meaningful justice," thus serving the punitive objective of the criminal system."

*Williams,* 385 Md. at 58–59, 867 A.2d at 310 (footnote omitted) (quoting *State v. Garnett,* 384 Md. 466, 475, 863 A.2d 1007, 1012 (some internal citations omitted)). Restitution may be imposed as a condition of probation or as part of a sentence.

*Pete v. State,* 384 Md. 47, 55, 862 A.2d 419, 423 (2004); *Garnett,* 384 Md. at 476, 863 A.2d at 1013.

Mr. Goff argues that the trial court erred by ordering restitution for three reasons: (1) the damage to the shower is not the direct result of the crime; (2) the shower is not the property of the victim; and (3) ordering replacement instead of repair is not fair and reasonable. We begin by discussing the State's contention that Mr. Goff's first two grounds for attacking the restitution order are not preserved for our review because defense counsel never raised them below. The State points out that Mr. Goff agreed to pay restitution and that the parties proceeded on an agreed statement of facts that included the following description: "Officer Warehime saw that Hadley had a bloody face and that the shower insert in the bathroom had been broken *due to the assault."* (Emphasis added.) Mr. Goff's brief does not address the preservation question. In oral argument, however, counsel argued that a defendant cannot agree to an illegal sentence and that, therefore, the question is properly before the Court.

As stated in Md. Rule 8–131(a), "[o]rdinarily, we will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." We note at the outset that it appears the issue was "raised in or decided by the trial court." Defense counsel did object at trial to the reasonableness of the amount of restitution ordered by the trial court, properly placing the review of the restitution order before us. Moreover, it is clear from the trial court's opinion on the record that the specific question of whether Mr. Hadley was the victim of the property damage was considered and decided by the trial court, even if not argued by the parties.

If the issues in this case had not been reviewed by the trial court, we would still consider Mr. Goff's appeal. As stated in *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949, 951 (1985):

[W]hen the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objection was made in the trial court. . . . Thus, a defendant who fails to object to the imposition of an illegal sentence does not waive forever his right to challenge that sentence.

An order to pay restitution as a condition of probation is part of the punishment for the crime. *Walczak,* 302 Md. at 426, n. 1, 488 A.2d 949. As such, "an illegal condition of probation can be challenged as an illegal sentence." *Id.*[7]

### The Direct Results of the Crime

In support of his argument that the damage to the shower was not a direct result of the crime of assault against Mr. Hadley, Mr. Goff relies on Section 11–603 of the Criminal Procedure Article, which provides, in pertinent part:

(a) *Conditions for judgment of restitution.*—A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

(1) as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;

(2) as a direct result of the crime or delinquent act, the victim suffered:

(I) actual medical, dental, hospital, counseling, funeral, or burial expenses;

(ii) any other direct out-of-pocket loss . . . .

---

**7.** *But see Lee v. State,* 307 Md. 74, 81, 512 A.2d 372, 375–76 (1986) (recognizing a narrow exception to the rule in *Walczak* and permitting payment of restitution in an amount greater than that involved in the crime for which the defendant has been convicted, where the defendant agreed to pay the additional amount pursuant to a plea agreement and there was an admission of guilt to the criminal acts underlying the additional loss).

(b) *Right of victims to restitution.*—A victim is presumed to have a right to restitution under subsection (a) of this section if:

 (1) the victim or the State requests restitution; and

 (2) the court is presented with competent evidence of any item listed in subsection (a) of this section.

Md.Code (2001, 2004 Supp.), § 11–603 of the Criminal Procedure Article.

■ As stated in *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995), "[t]he first step in determining legislative intent is to look at the statutory language and '[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' " *Oaks*, 339 Md. at 35, 660 A.2d at 429 (quoting *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994)).

In *Pete v. State*, 384 Md. 47, 862 A.2d 419 (2004), we determined that the property damage for which the defendant was ordered to pay restitution was not the direct result of the crime of assault for which Pete was convicted. In *Pete*, the defendant entered the apartment of Susan Raickle and hit her on the back of the head. *Pete*, 384 Md. at 51, 862 A.2d at 421. Ms. Raickle called the police who broadcasted a lookout for Mr. Pete. *Id.* Almost two hours later, Patrolman First Class Cheesman saw a man matching Mr. Pete's description in a truck stopped at a traffic light. *Id.* Patrolman Cheesman turned on his overhead lights and attempted to stop Mr. Pete, who sped away from the police cruiser. *Id.* During the chase, Mr. Pete stopped abruptly, causing Patrolman Cheesman to strike Mr. Pete's truck. *Pete*, 384 Md. at 52, 862 A.2d at 421. The police cruiser sustained $6,490.53 in damages. *Id.* Mr. Pete was convicted of second degree assault and reckless driving, among other things. *Pete*, 384 Md. at 49, 862 A.2d at 420. For the assault on Ms. Raickle, the court sentenced him to eighteen months, with all but two months suspended. *Id.* The court also placed Pete on probation for three years upon

his release. *Id.* The conditions of his probation included an order to make restitution to the victim for her injuries, and to the Local Government Insurance Trust (LGIT) for repairs to the police cruiser. *Pete,* 384 Md. at 50, 862 A.2d at 420.

We held that restitution to the LGIT as a part of the sentence for assault was improper "because the damage to Patrolman Cheesman's cruiser did not arise as a 'direct result' of the second degree assault on Ms. Raikle." *Pete,* 384 Md. at 57, 862 A.2d at 424.[8] We reaffirmed, stating:

"The chief goal of statutory interpretation is to discover the actual intent of the legislature in enacting the statute, and the legion of cases that support this proposition need not be repeated here. In fact, all statutory interpretation begins, and usually ends, with the statutory text itself for the legislative intent of a statute primarily reveals itself through the statute's very words. A court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application. In short, if the words of a statute clearly and unambiguously delineate the legislative intent, ours is an ephemeral enterprise. We need investigate no further but simply apply the statute as it reads."

*Pete,* 384 Md. at 57–58, 862 A.2d at 425 (quoting *Price v. State,* 378 Md. 378, 387–88, 835 A.2d 1221, 1226 (2003)). Mr. Pete

---

8. Though not relevant to the resolution of the instant case, we point out for the sake of completeness that we also held in *Pete* that restitution to the LGIT was not available under § 11–603 of the Criminal Procedure Article for the reckless driving charge, even though the damage to the police cruiser was "undoubtedly a direct result of the reckless driving." *Pete,* 384 Md. at 56, 862 A.2d 419. That decision was based on the fact that reckless driving is not a "crime" for which restitution may be ordered, as that term is defined by § 11–601(d)(2). The 2001 § 11–601(d)(2) provided that " '[c]rime' includes a violation of the Transportation Article that is punishable by a term of confinement." Md.Code (2001), § 11–601(d)(2) of the Criminal Procedure Article. Reckless driving, under § 21–901.1 of the Transportation Article, is not an offense that may be punished by a term of confinement. Md.Code (1977, 2002 Repl.Vol.), § 21–901.1 of the Transportation Article.

argued that we should interpret the statute to mean that "a direct result of a crime is limited to the victim of the qualifying crime and that victim's injuries and/or damages arising from that crime." *Pete*, 384 Md. at 59, 862 A.2d at 426. Mr. Pete also suggested that we apply a proximate cause analysis to determine the extent of "direct result" under the statute. *Id.* The State argued that we should conclude that "any count for which a defendant is convicted under the same charging document would be sufficient to satisfy the statutory 'direct result' test." *Pete*, 384 Md. at 60, 862 A.2d at 426.

In deciding this issue, Judge Harrell, writing for the Court said:

> The standards governing restitution as a direct penalty for the second degree assault conviction in this case require a particular type of crime, a victim, and damages as a *direct result of the crime.* We need not engage in a tort causal relationship analysis, nor weigh the persuasion quotient of an attenuated nexus between the damages to Patrolman Cheesman's police cruiser and the assault on Ms. Raickle. The General Assembly has required a direct result between the qualifying crime committed and the damages inflicted before restitution may be ordered.
>
> * * *
>
> It is easy to see on this record that the damage to the police cruiser could not be a direct result of the assault on another individual that occurred approximately two hours earlier than the vehicle collision.

*Pete*, 384 Md. at 60–61, 862 A.2d at 426–27.

By contrast, in the instant case, Mr. Hadley's assaultive behavior directly caused the damage to the shower, in addition to causing physical injury to Mr. Hadley. That fact is easily established by a review of the record, which included the agreed-upon fact that "Officer Warehime saw that Hadley had a bloody face and that the shower insert in the bathroom had been broken due to the assault." Mr. Goff argues that, while physical injury to Mr. Hadley resulting from the assault

may be a "direct result" of the assault, the damage to the shower "cannot legitimately be said to be the 'direct result' of that crime." Mr. Goff offers no support in his brief or in oral argument for that conclusory assertion, and we are unable to find any support in the record or the law.

Section 11–601 of the Criminal Procedure Article, the definition section of the restitution statute, does not include a definition of the term "direct result." As noted in *Schmerling v. Injured Workers' Insurance Fund*, 368 Md. 434, 795 A.2d 715 (2002), when statutory definitions are not explicitly provided, "we determine the intended scope of the term by applying the language's natural and ordinary meaning, by considering the express and implied purpose of the statute, and by employing basic principles of common sense, the meaning these words intend to convey." *Schmerling*, 368 Md. at 444, 795 A.2d at 720. The natural and ordinary meaning of the term "direct result" most certainly includes the damage done to the shower in the instant case.[9] It is clear that Mr. Goff damaged the shower during and because of the assault on Mr. Hadley. No intervening agent or occurrence caused the damage. Additionally, no time lapsed between the criminal act and the resulting damage caused.[10] That leads us to conclude, considering the plain language of the statute, that the damage to the shower was a direct result of the crime for which Mr. Goff was convicted.[11] Therefore, the order to pay restitution was proper.

---

9. "Direct" is defined as "stemming immediately from a source, [as in direct] result . . . proceeding from one point to another in time or space without deviation or interruption . . . marked by absence of an intervening agency, instrumentality, or influence. . . ." Merriam–Webster's Collegiate Dictionary 327 (10th ed.2001).

10. By contrast, in *Pete*, a significant amount of time lapsed between the criminal act and the property damage. Moreover, events other than Pete's assault on Ms. Raikle caused the damage to the police cruiser in that case.

11. The instant case is also distinguishable from *Williams v. State*, 385 Md. 50, 867 A.2d 305 (2005), in which we vacated an order of restitution. In *Williams*, the defendant stole motorcycles from the

*The Victims of the Crime*

█ Section 11–601 of the Criminal Procedure Article defines "victim" as "a person who suffers personal injury or property damage or loss as a direct result of a crime...." Md.Code (2001, 2004 Supp.), § 11–601(j)(1) of the Criminal Procedure Article. Mr. Goff argues that because the victim of the assault (Mr. Hadley) is a tenant and not the owner of the apartment, § 11–603 does not permit the court to order payment of restitution to Mr. Hadley for the repair of the shower, in connection with the assault conviction. In his brief, Mr. Goff argues that "the property owner was the party who truly suffered the loss via any property damages, and [Mr. Goff] was not convicted of any crime wherein the landlord/property owner ... was the victim. Thus, the restitution award to Mr. Hadley ... for the property damage/loss suffered by the landlord ... was inappropriate under § 11–603." As previously discussed, § 11–603 permits a court to order a defendant to make restitution if "as a direct result of the crime ... *property of the victim* was stolen, damaged, destroyed...." Md.Code (2001, 2004 Supp.), § 11–603(a)(1) of the Criminal Procedure Article (emphasis added).

█ While it is true that Mr. Hadley does not own the apartment in which he lives, it is equally true that as a tenant he has a property interest in the nature of a possessory property right in the apartment.[12] The fact that the landlord

---

victim which were later recovered by the police and placed in the city lot. *Williams,* 385 Md. at 52, 867 A.2d at 307. The city would not release the vehicles from the lot because the victim had not registered them. *Id.* We held that,

> [the victim's] inability to reclaim the undamaged motorcycles was not the direct result of Williams's theft of them. While there is undeniably a causal link between the theft in Baltimore County and the motorcycles ending up in the Baltimore City impoundment lot, that nexus does not partake of the directness required by the statute. Moreover, [the victim's] failure to produce proof of ownership to secure release of the vehicles is in no way a direct result of their underlying theft.

*Williams,* 385 Md. at 62, 867 A.2d at 312–313.

12. A leasehold estate or tenancy is more than a non-possessory interest in property, yet something less than a present freehold estate. To better

*also* suffered a loss to his property does not change the fact that the tenant suffered a loss to his possessory property right, for which restitution may properly be granted pursuant to § 11–603.[13] We strive to give statutes their "most reason-

---

understand the nature of the landlord-tenant relationship, the spectrum of interests in property should be analyzed. On one end of the spectrum is a non-possessory interest in property. For example, a lodger or roomer may be entitled to the mere use of the premises subject to the control of a hotel owner. At the other end of the spectrum is the present freehold estate, which involves the conveyance of both present possessory and future interest estates. In the middle of the spectrum is tenancy, which involves the conveyance of a present possessory leasehold estate.... In a freehold or leasehold estate, the holder has a possessory interest and, therefore, has property-based remedies, such as an action in trespass to protect or regain possession, available to the leaseholder against both the owner and third parties.... One party, the landlord, allows to the other, the tenant, a temporary claim and possession of land, thereby creating a property interest, in return for a fixed fee paid over a period of time.
DOUGLAS M. BREGMAN & GARY G. EVERNGAM, MARYLAND LANDLORD–TENANT LAW PRACTICE AND PROCEDURE, at 15–16 (3d ed.2003)

13. The shower insert is clearly a fixture. Under the common law, fixtures are treated as part of the realty. A fixture is "an item that is so connected to the land that it [cannot] be removed without substantial injury to itself or the land." *Colonial Pipeline Co. v. State Dept. of Assessments and Taxation,* 371 Md. 16, 32–33, 806 A.2d 648, 658 (2002) (citing Richard R. Powell, Powell on Real Property § 57–23 (1969)). Ordinarily, the nature of the landlord-tenant relationship is such that the landlord transfers to the tenant everything that is properly appurtenant to the demised premises or everything essential or reasonably necessary to the full beneficial use and enjoyment of the property. *Jackson v. Birgfeld,* 189 Md. 552, 554, 56 A.2d 793, 795 (1948). Hence, Mr. Goff's damage to the shower insert interfered with Mr. Hadley's use, possession and enjoyment of the premises.

Furthermore, the common law rule is that the tenant has a duty to keep the leased premises in repair. *Shum v. Gaudreau,* 317 Md. 49, 65, 562 A.2d 707, 715 (1989). "The duty has been interpreted as demanding no more than that the tenant keep the premises 'windtight and watertight.' " *Shum,* 317 Md. at 65, 562 A.2d at 715 (quoting *Katz v. Williams,* 239 Md. 355, 360, 211 A.2d 723, 726 (1965)). "A tenant is required to surrender the premises in good condition at the end of the term with allowances generally made for normal 'wear and tear.' " DOUGLAS M. BREGMAN & GARY G. EVERNGAM, MARYLAND LANDLORD–TENANT LAW PRACTICE AND PROCEDURE, at 24 (3d ed.2003) (footnote omitted). Moreover, the common law "does not impose any obligation upon the landlord to repair the premises or to rebuild or restore any building destroyed without his fault, in the

able interpretation, in accord with logic and common sense, and to avoid a construction not otherwise evident by the words actually used." *Greco v. State,* 347 Md. 423, 429, 701 A.2d 419, 422 (1997). To interpret the term "property of the victim" so narrowly as to discount the property rights of tenants vis-a-vis restitution in a criminal case such as this one is not "in accord with logic and common sense." Moreover, our interpretation is supported by the underlying purposes of restitution; namely, rehabilitation, deterrence, and retribution. *Grey,* 363 Md. at 459, 769 A.2d at 899.[14] Mr. Hadley testified that he was responsible for repairing the shower and that his landlord expected him to repair it. Mr. Goff presented no evidence to refute that assertion. Consequently, the court did not err by deciding that Mr. Hadley was the proper victim for purposes of § 11–603.[15]

---

absence of an agreement to do so." *Miller v. Howard,* 206 Md. 148, 154, 110 A.2d 683, 685 (1955). Mr. Hadley testified that he was responsible for fixing the shower and that his landlord expected him to do so. There was no evidence that there was any agreement that the landlord would repair the premises.

In addition, in the appropriate case, it may be proper for the court to order restitution payable jointly to two or more persons because they have a joint interest in the property loss/damage. A joint restitution order was not necessary in this case because the tenant, Mr. Hadley, was responsible for repairing the damage to the shower.

14. As described by Judge Wilner,

Restitution is regarded as rehabilitative to the extent that it causes the offender to focus on the victim and the harm that he or she has caused to the victim. . . . Restitution is viewed as a deterrent, more so than a civil judgment, because it is usually tailored to the defendant's ability to pay and it must be paid personally by the defendant, not by an insurance company or other third party. . . . The retributive value of restitution lies not only in the personal economic detriment to the offender, who may be saddled with a non-dischargeable debt for quite some time, but as well in satisfying society's demand for meaningful justice.

*Grey,* 363 Md. at 459–60, 769 A.2d at 899–900.

15. *See People v. Christman,* 265 A.D.2d 856, 696 N.Y.S.2d 594, 595 (1999), leave to appeal denied, 726 N.E.2d 487, 94 N.Y.2d 878, 705 N.Y.S.2d 10 (2000) (upholding an order of restitution to the tenant of a building vandalized by the defendant and rejecting the contention "that the business tenant of the building vandalized by defendant is not a 'victim' for the purpose of receiving restitution. The record established

▮▮▮▮▮▮▮

This case is not like *Walczak v. State,* 302 Md. 422, 488 A.2d 949 (1985), in which we determined that the trial court erred by ordering Walczak to pay restitution to the victim of a robbery of which he was not convicted. *Walczak,* 302 Md. at 430, 488 A.2d at 953. We stated that "restitution is punishment for the crime of which the defendant has been convicted. Restitution depends on the existence of that crime, and the statute authorizes the court to order restitution only where the court is otherwise authorized to impose punishment." *Walczak,* 302 Md. at 429, 488 A.2d at 952. In the present case, the court ordered Mr. Goff to pay restitution as punishment for the crime of which he was convicted—assault, which resulted in damage to Mr. Hadley's person and property.

▮▮▮▮▮▮ Concluding our discussion of this issue, we note that during oral argument, counsel for Mr. Goff raised a number of concerns about what might happen civilly if Mr. Hadley takes the restitution money and fails to repair the shower. We decline to respond to those questions because an answer is not necessary for us to decide the present case. We re-emphasize, however, that restitution is a criminal sanction, not a civil remedy. *Grey,* 363 Md. at 451, 769 A.2d at 895. Furthermore, we remind the parties that,

[t]he order of restitution, even when entered as a civil judgment, concludes only the matters that were raised or that could have been raised, in the criminal proceeding. Although it may be enforced in the manner that a civil judgment may be enforced, it does not, and cannot, establish civil liability for anything beyond the matters it concludes.

*Id.*

*The Reasonableness of the Restitution Order*

▮▮▮▮ Finally, Mr. Goff argues that the restitution award should have been for repair of the shower instead of replacement because, in his view, complete replacement is not reasonable. Mr. Goff argues that replacement is unreasonable be-

that the tenant was a 'victim' of defendant's damaging the windows in the building and a computer used by the tenant in his business.").

cause the $2,156.00 replacement estimate was based on what Mr. Hadley told the estimator about the damage and not based on the estimator's first-hand view of the damaged shower. Mr. Goff also complains that Mr. Hadley only sought out one estimate for the cost of replacement.

Mr. Goff relies on § 11–615 in support of his argument, which provides:

(a) *Fair and reasonable charges.*—In a restitution hearing held under § 11–603 of this subtitle, a written statement or bill for medical, dental, hospital, counseling, funeral, or burial expenses is legally sufficient evidence that a charge shown on the written statement or bill is a fair and reasonable charge for the services or materials provided.

(b) *Burden of proof.*—A person who challenges the fairness and reasonableness of the amount on the statement or bill has the burden of proving that the amount is not fair and reasonable.

Md.Code (2001), § 11–615 of the Criminal Procedure Article.[16] The trial court held two hearings on the question of the cost to repair or replace the damaged shower. At the first hearing, Mr. Hadley, a master plumber himself, testified about the damage to the shower and stated that there were "numerous holes and cracks all through the side of the shower." In addition, the State introduced a written estimate from Caton Plumbing in the amount of $2,156, signed by Kevin Ohl. At the second hearing, the State called Kevin Ohl who testified in detail about the need to replace the shower and the cost to do so. Mr. Goff testified that he had obtained an estimate for some supplies at Lowe's and an estimate for the cost of repairing the shower from a contractor, named Mr. Blizzard, in the amount of $523.00. Mr. Goff presented no evidence to

---

16. It appears from the argument in the trial court that both parties assumed that § 11–615 applied to the facts of this case, even though the kind of expenses at issue in this case are not mentioned in that section. Nonetheless, the standard described therein regarding the proof of reasonableness of particular expenses is also the correct standard to apply in restitution hearings concerning expenses not specifically mentioned in that section.

rebut the testimony of Mr. Ohl regarding the need or cost to replace the shower. By contrast, Mr. Ohl testified that the estimate provided by Mr. Blizzard was far below current market prices. As previously mentioned, after hearing the evidence, the court stated:

> Here what we have is an item which was probably, prior to the incident, perfectly functional and after the incident, it's not functional . . . it's not the value of the shower stall here, it's the value of the materials and services needed to replace it because it's no longer functional and I think the testimony, the last time, was adequate to establish that.

> So, then, the issue is, what is a fair amount of restitution, assuming that the item has to be replaced . . . it is the burden of the Defendant to show that the suggested charges by the State are not fair and reasonable and that I think the Defendant has—has not met his burden.

In view of the testimony presented at the restitution hearings, the trial court did not err or abuse its discretion in determining that the State's estimate to replace the shower was fair and reasonable under the circumstances.

## CONCLUSION

In summary, we hold that: (1) the damage to the shower is one of the direct results of the crime of assault; (2) the shower is the property of the victim of the assault, even though he is the tenant and not the owner of the apartment; and (3) ordering replacement of the shower instead of repair was fair and reasonable under the circumstances.

***JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED; APPELLANT TO PAY COSTS.***